UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 1:19-cr-00304 (CKK) |
| | : | |
| OCEANWORKS INTERNATIONAL, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**GOVERNMENT'S AMENDED MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully submits its Memorandum in Aid of Sentencing for Defendant OCEANWORKS INTERNATIONAL CORPORATION (Defendant or OCEANWORKS). For the reasons set forth below, the government submits that the sentence agreed to in the plea agreement between the parties in this case, filed on September 10, 2019 (ECF No. 4), is an appropriate sentence. Accordingly, we request that the Court accept the plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) and impose an $84,000 fine upon the Defendant at sentencing.

**INTRODUCTION**

Defendant has pled guilty to Count One of the Information, which charges it with one count of Scheming to Falsify, Conceal, and Cover up Material Facts from the Department of Commerce's Office of Export Enforcement, in violation of Title 18, United States Code, Section 1001. Defendant willfully omitted material facts in connection with statements made to the Department of Commerce's Office of Export Enforcement (OEE). These statements concerned possible exportation or re-exportation of export-controlled technology to persons in China.

1

## FACTUAL SUMMARY

### A. Relevant Background on Defendant OCEANWORKS INTERNATIONAL

The U.S. Navy, headquartered in Washington, D.C., selected Defendant as the prime contractor for the design, construction, and testing of numerous Submarine Rescue Diving Recompression System (SRDRS) elements. The SRDRS was to be used to assist crewmembers in distressed submarines. The contract scope of work included the Pressurized Rescue Module (PRM) System (PRMS). The PRM was a tethered, remotely operated rescue vehicle (RORV). It contained a transfer skirt that could be used to dock the PRM with the distressed submarine. The PRMS could carry up to eighteen personnel rescued from a distressed submarine.

In 2016, BEIJING COMPANY, a company based in mainland China, purchased Defendant. In particular, in or around September and October 2016, BEIJING COMPANY bought OCEANWORK's shares for $15 million USD. For an additional $5 million USD, BEIJING COMPANY acquired OCEANWORK's assets, which included the intellectual property associated with submarine rescue technology.

### B. The Role of Glen Omer Viau and Others

Glen Omer Viau first worked for OCEANWORK's predecessor company and then for OCEANWORKS from 1992 to 2011. He was re-hired as President shortly after OCEANWORKS was acquired by BEIJING COMPANY on September 26, 2016. Viau ultimately reported to BEIJING COMPANY's Chief Executive Officer.

Beginning on or about September 30, 2016, Viau and Defendant employees, with the assistance of BEIJING COMPANY, developed a proposal to the People's Liberation Army (PLA) Navy, the Chinese equivalent of the U.S. Navy. This proposal concerned the RORV Project, a

submarine rescue vehicle (SRV) to be designed and built by Defendant and BEIJING COMPANY for the PLA Navy.

On or about October 12, 2016, Viau met with several U.S. Navy employees to discuss, among other things, the sale of Defendant to a Chinese company. Based on this meeting, U.S. Navy personnel understood that Defendant still had a security program in place so the U.S. Navy information would be firewalled from the new ownership and that the U.S. Navy information would be protected.

From on or about November 4 to on or about November 16, 2016, Viau was in China meeting with representatives of BEIJING COMPANY. While in CHINA, Viau sought and received access to OCEANWORK's archived files regarding the PRMS.

On November 16, 2016, Viau sent to a BEIJING COMPANY employee via email a presentation concerning strategy options for the PLA Navy RORV Project proposal. One of Viau's strategy options offered to provide to BEIJING COMPANY detailed information about the type of work Defendant did for the U.S. Navy.

On or about November 16, 2016, Viau emailed to PERSON 1 a 17-page presentation. The file was titled "BoD discussion 16 Nov 2016." Slide one of the presentation was titled "[BEIJING COMPANY] – [OCEANWORKS]." On this slide was a bullet for "Chinese Navy SRS [Submarine Rescue System] Project." Slides 14 through 17 were titled "Chinese Navy RORV Project." Slide 15, under a strategy heading, stated that execution of the plan would consist of, "Detailed information about what [Defendant] did for US Navy project." Slide 17, under an "Execution Issues" heading, stated the following. "Export permit and timing of US Navy." [Defendant] will need to apply for an export permit to export the system design & components to China. This will

take 6-8 weeks. Preferable we won't start this until after the US Navy contracting issue is resolved. Perception management is important."

On or about November 17, 2016, Viau received an email from an individual (PERSON 1) who worked for both Defendant and BEIJING COMPANY regarding the RORV Project. In this email, titled "Chinese SRV project," PERSON 1 wrote that BEIJING COMPANY would present the SRV presentation to PLA Navy personnel the following Tuesday [November 22, 2016], and that this would be the meeting to decide if BEIJING COMPANY had the chance to be the SRV supplier to the PLA Navy. PERSON 1 asked Viau (and others) to provide "What we did for US Navy and the current shape of the system. As detail[ed] as possible, maybe with some background [on why] we were chose[n]." PERSON 1 also asked for a comparison between the U.S. Navy system and the Chinese system and why the U.S. Navy system was better. PERSON 1 asked for the recipients to send the information to a BEIJING COMPANY employee and copied on the email BEIJING COMPANY's Deputy General Manager for the Military Business Unit.

On November 18, 2016, in response to PERSON 1's email above, Viau emailed to PERSON 1 and others, in China, a 34-page document titled "[Defendant] Rescue System Experience," authored by Viau. The subject line of the email was "Chinese SRV Project." Some of the information contained in this document concerned the U.S. Navy PRM transfer skirt. Viau wrote that the attached presentation would be a good start for the upcoming discussion. At the time he sent the email, Viau understood that the email recipients were in China.

Between in or around December 2016 and February 2017, Viau assisted in arranging for PERSON 2, a former Defendant employee, to travel to China to assist BEIJING COMPANY in its RORV proposal to the PLA Navy. On or about February 6, 2017, PERSON 2 emailed Viau and

4

others. The subject line of the email was "Chinese System Requirements," and attached was a document titled "Chinese Navy Requirements." The document referred to the requirements for an RORV rescue system. PERSON 2 asked the email recipients to provide content for a section of the document concerning specifications for the proposed PLA Navy RORV system.

On or about February 8, 2017, a Defendant employee who was a mechanical engineer and design supervisor, sent an email to Viau; PERSON 2; and PERSON 3, another mechanical engineer employed by Defendant. The subject line of the email was "Chinese RORV Advantages;" and attached to the email was a document with a table comparing the surveillance systems of the U.S. Navy's PRM to systems proposed for the PLA Navy's RORV.

On or about February 13, 2017, Viau received an email from PERSON 2 concerning BEIJING COMPANY's RORV proposal to the PLA Navy. PERSON 2 noted that BEIJING COMPANY was "putting together a comprehensive document on the RORV for the Chinese Navy" to be presented the following week and requested information for various content sections from the email recipients. PERSON 2 further stated, "Most, if not all, of it could be developed by regurgitating requirements from the PRMS SOW [Scope of Work] and other documents." PERSON 2 requested content related to numerous technical designs.

On or about February 16, 2017, Viau was copied on an email from PERSON 3 to PERSON 2 (who was in China) attached to which were six documents. At least one of the enclosed multi-page technical drawings was controlled under ECCN 8E620.a, and therefore required an export license before being sent to China. Two of these documents had a U.S. government Distribution statement that read: "Distribution authorized to U.S. government agencies only. Other requests for this document shall be referred to Commanding Officer, Naval Sea Systems Command (OOC),

Arlington, VA 22242." Defendant willfully shared these documents with Person 2 to assist with the development of its proposal, but Defendant did not have permission from the U.S. Navy to share these documents.

On or about February 17, 2017, Viau emailed the U.S. Navy in response to questions posed by the U.S. Navy as follows:

> U.S. Navy Question: What access does the now Chinese parent company or any Chinese Nationals have to [OCEANWORKS] technology, IP, technical manuals/data?
>
> Viau's Response: [Defendant] continues to operate as an independent Canadian company and release of [Defendant's] technology, IP, technical manuals/data is controlled by Canadian export regulations to the extent that [Defendant's] products and data are subject to export controls. There are no Chinese Nationals currently employed by [Defendant].
>
> U.S. Navy Question: What access does the now Chinese parent company or any Chinese Nationals have to technology, technical manuals/data, government furnished information, U.S. Naval specifications and standards and any other documentation, information, and/or systems which were provided to [Defendant] under a U.S. Government contract in the execution of its duties and responsibilities to perform?
>
> Viau's Response: [Defendant] handles data from any customer in accordance with the applicable data rights, distribution statements or confidentiality requirements. Restrictions on release apply to the parent company/shareholder just as they would to any third party. As previously noted there are no Chinese Nationals currently employed by [COMPANY] 1. Also there have been no special security requirements associated with the US Government work that [Defendant] has been involved with however [Defendant] is open to putting in place additional data segregation and control procedures if the Government believes that additional measures are warranted to protect confidential information. In addition[,] Defendant has a Canadian Government Industrial Security program in place with a designated company security officer and associated security clearances for designated personnel. Defendant has never been involved in U.S. Government work that requires security clearances.

> U.S. Navy Question: Does BEIJING COMPANY have any affiliation with or do business with the PLA Navy?
>
> Viau's Response: BEIJING COMPANY is not affiliated with the PLA Navy. BEIJING COMPANY's products are dual use in the sense that they can be used on civil and military vessels. The products BEIJING COMPANY supplies are not sensitive from a military or defense perspective. BEIJING COMPANY has never had any contract directly with the PLA Navy. It is, however, a subcontractor to ship building companies that serve the PLA Navy.

In fact, BEIJING COMPANY had purchased Defendant, and Viau had allowed the U.S. Navy technical data to be sent to China. Moreover, Viau knew that, during that same week, OCEANWORKS, with the assistance of BEIJING COMPANY, had prepared a proposal to the PLA Navy for an RORV, based on PRM technical data and specifications.

On or about March 28, 2017, Viau learned that the U.S. Navy was terminating its contracts with Defendant. In a March 28, 2017 email to Viau, the U.S. Navy informed Viau that: (1) "[T]he Department of Navy is prohibited from procuring supplies or services that are controlled under the 600 series of the Commerce Control List (CCL) from Communist Chinese Military Companies;" (2) "The SRDRS is controlled under the CCL 600 series. The Department of Commerce issued a formal determination that the Pressurized Rescue Module (PRM) is classified under ECCN 8A620.A;" (3) "[Defense Acquisition Regulation System §] 252.225-7007(a) defines a Communist Chinese Military Company as, '(1) A part of the commercial or defense industrial base of the People's Republic of China; or (2) Owned or controlled by, or affiliated with, an element of the Government or armed forces of the People's Republic of China;'" and (4) "The fact that [BEIJING COMPANY] is a subcontractor to ship building companies that serve the PLA Navy, fits the above definition as a Communist Chinese Military Company as [BEIJING COMPANY] is

7

affiliated with an element of the Government or armed forces of the People's Republic of China."

Therefore, as of March 2017, OCEANWORKS understood that the PRM Transfer Skirt was classified by the U.S. Department of Commerce under Export Control Classified Number (ECCN) 8A620.x, and technology for this item was classified as ECCN 8E620.a. Items classified under ECCN 8A620.x and 8E620.a required a license before export (including via email) to any end user in China.

On or about May 16, 2017, Canada's Investment Review Division ordered divestiture of the BEIJING COMPANY and OCEANWORKS transaction. The order prohibited BEIJING COMPANY from "access[ing] OCEANWORKS's know-how, trade secrets or confidential information used to carry on the Canadian business, including its premises and electronic information and technology systems."

### C. The September 2017 Initial Notification and March 2018 VSD

On or about September 27, 2017, Viau, on behalf of Defendant, filed an "Initial Notification" with the Department of Commerce's Office of Export Enforcement (OEE) located in Washington, D.C. Among other things, Viau advised the OEE that: (1) on September 28, 2016, OCEANWORKS had provided a hard drive (Hard Drive) with OCEANWORKS's intellectual property to a Chinese national, who then had hand-carried the Hard Drive to China; (2) OCEANWORKS had later discovered that the PRMS was controlled under ECCN 8A620.a.; (3) OCEANWORKS and BEIJING COMPANY "now understand" that the exports of PRMS technology had required a license; (4) OCEANWORKS was "reviewing these apparent unintentional violations;" and (5) BEIJING COMPANY "did not have plans to use the IP stored on the hard drive for any specific purpose," and instead had "planned to work through

8

OCEANWORKS in Canada using OCEANWORKS personnel to develop subsea systems for use in China."

On or about March 26, 2018, and pursuant to 15 C.F.R. § 764.5, Viau filed a voluntary self-disclosure (VSD), which disclosed violations related to the transaction that resulted in the sale of Defendant's assets, including its intellectual property, to BEIJING COMPANY, as well as the export of IP to China, which export required a license from DOC. The disclosed violations concerned only the Hard Drive, which was transported in 2016.

In the March 26, 2018 VSD, Viau, on behalf of Defendant, wrote, among other things, that: (1) as part of the transfer of IP to BEIJING COMPANY, an unauthorized export of controlled technology in Canada to a BEIJING COMPANY representative, who is a national of China, took place, as well as a second physical export of that technology from Canada to China; (2) the technology at issue for the PRM was designated under ECCN 8E620; (3) this technology, along with "all other OCEANWORKS [IP]," was returned in good faith to OCEANWORKS in Canada approximately eight months after the initial deemed reexport; the technology "has not been the subject of further reexports"; (4) because the PRMS Falcon was specifically designed for use by the U.S. Navy, it is properly described in the CCL under ECCN 8A620.a, which covers "[s]ubmersible and semi-submersible vessels 'specially designed' for a military use and not enumerated or otherwise described in the USML [United States Munitions List]"; (5) "No other violations by the Parties were identified during the course of the Compliance Review;" (6) BEIJING COMPANY had no "independent use for OCEANWORKS's IP, as [BEIJING COMPANY's] strategy had been for OCEANWORKS's product-lines to be produced and delivered directly by OCEANWORKS in Canada" and the PRM technical data was "delivered to

9

adhere to the specific standards of the U.S. Navy's Deep Submergence Unit, rendering the specific design unhelpful for use in any other contexts;" and (7) BEIJING COMPANY and OCEANWORKS had fully complied with the IRD Order, which, according to the VSD, precluded BEIJING COMPANY from accessing OCEANWORKS's technology.

Viau signed the March 26, 2018 VSD, attesting that, "[a]s required by 15 C.F.R. § 764.5(c)(5), I hereby certify that the foregoing representations are true and correct to the best of my knowledge and belief."

Defendant willfully and materially omitted that BEIJING COMPANY ever sought to enter the SRV industry or that Defendant, with the assistance of BEIJING COMPANY, worked on a proposal to be made for an SRV for the PLA Navy.

## DETERMINING THE SENTENCE

"Federal sentencing law requires the district judge in every case to impose 'a sentence sufficient, but not greater than necessary, to comply with' the purposes of federal sentencing, in light of the Guidelines and other § 3553(a) factors." *Freeman v. United States*, 564 U.S. 522, 529 (2011) (citing 18 U.S.C. § 3553(a)). "Rule 11(c)(1)(C) permits the defendant and the prosecutor to agree that a specific sentence is appropriate, but that agreement does not discharge the district court's independent obligation to exercise its discretion." *Freeman*, 564 U.S. at 529.

When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives—that is, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide

the defendant with needed educational or vocational training and medical care. *See* 18 U.S.C. §§ 3553(a)(1) and (2). In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court ruled that the United States Sentencing Guidelines (U.S.S.G. or Guidelines) are no longer mandatory. However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). The Supreme Court has "recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

In *Freeman*, a plurality of the Supreme Court discussed the interplay between a court's acceptance of a plea under Rule 11(c)(1)(C) and the Guidelines:

> Rule 11(c)(1)(C) makes the parties' recommended sentence binding on the court "once the court accepts the plea agreement," but the governing policy statement confirms that the court's acceptance is itself based on the Guidelines. *See* USSG § 6B1.2. That policy statement forbids the district judge to accept an 11(c)(1)(C) agreement without first evaluating the recommended sentence in light of the defendant's applicable sentencing range. The commentary to § 6B1.2 advises that a court may accept an 11(c)(1)(C) agreement "only if the court is satisfied either that such sentence is an appropriate sentence within the applicable guideline range or, if not, that the sentence departs from the applicable guideline range for justifiable reasons." *Cf. Stinson v. United States*, 508 U.S. 36, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993)(Guidelines commentary is authoritative). Any bargain between the parties is contingent until the court accepts the agreement. The Guidelines require the district judge to give due consideration to the relevant

11

> sentencing range, even if the defendant and prosecutor recommend a specific sentence as a condition of the guilty plea.

564 U.S. at 529-30. Accordingly, in this case, the Court should first evaluate the recommended sentence in light of Defendant's applicable Guideline range. The Court next should analyze the factors set forth in 18 U.S.C. § 3553(a) in determining whether the recommended sentence is reasonable.

### A.     United States Sentencing Guidelines Calculation

The government agrees with the Presentence Investigation Report (PSR) that the applicable Guideline range in this case is a $70,000 to $140,000 fine, based on a total offense level of 12 and a Culpability Score of 5. PSR at ¶¶ 50, 62, and 68. As noted above, the plea agreement contemplates a sentence of a fine of $84,000, which is within the applicable Guideline range. As discussed below, this sentence also is consistent with an analysis of the 18 U.S.C. § 3553(a) factors.

### B.     Statutory Penalties

Defendant is facing a maximum sentence of a $500,000 fine for its conviction. 18 U.S.C. §§ 1001, 3571(c)(3); *see also* PSR at ¶ 66.

### C.     Analysis of 18 U.S.C. § 3553(a) Factors

As discussed below, an analysis of the factors provided in 18 U.S.C. § 3553(a) shows that an $84,000 fine is an appropriate sentence in this case.

#### 1.     The Nature and Circumstances of the Offense

The crime to which Defendant pled guilty—Scheming to Falsify, Conceal, and Cover up Material Facts from the Department of Commerce's Office of Export Enforcement, in violation of Title 18, United States Code, Section 1001—is a serious offense. It is a felony punishable by a fine of up to $500,000 (for an entity) and up to five years in prison (for an individual). In this case, the

underlying conduct consisted of a scheme to conceal and cover up material facts from the OEE relating to the export of export-controlled technical data. Defendant's scheme reasonably could have impeded OEE's investigation of unlawful exports to China and possible exposure of U.S. Navy PRM technical data to persons and entities in China. The government believes that this crime encapsulates Defendant's criminal conduct in this case.

        2.        <u>The History and Characteristics of the Offender</u>

Defendant is a Canadian company that was liquidated in early 2018; it has remained as an ongoing concern only to address windup obligations. PSR at ¶ 41. Defendant has no prior convictions of which the government is aware.

        3.        <u>The Need to Promote Respect for the Law, To Provide Just Punishment, To Afford Adequate Deterrence, and to Protect the Public</u>

Sentencing Defendant to an $84,000 fine will serve the governmental interests in providing a just punishment that sufficiently deters others and protects the public. While the offense was non-violent and is a misdemeanor, the government takes seriously the provision of false and misleading statements to the OEE and other government agencies. The recommended sentence reflects the significant interests at stake.

        4.        <u>The Need to Provide the Defendant with Educational or Vocational Training</u>

Defendant has no need for additional educational or vocational training.

        **5.**        <u>The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct</u>

The starting point in the Court's analysis under § 3553(a)(6) should be to consider the sentences of "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The government has not found any cases with facts analogous to this case.

The government did locate two cases involving false statement convictions of corporate defendants that may be instructive to the Court. *See United States v. Automated Medical Labs, Inc.*, 770 F.2d 399 (4th Cir. 1985); and *United States v. Cecil Grain, Inc.*, 556 F. Supp. 1985 (N.D. Ohio 1983).

Automated Medical Labs, Inc. (AML) and one of its wholly-owned subsidiaries, Richmond Plasma Corporation (RPC), were charged with "engaging in a conspiracy that included falsification of logbooks and records required to be maintained in connection with the commercial enterprise of producing blood plasma." 770 F.2d at 400. The purpose of the scheme allegedly was "to conceal from the Food and Drug Administration ('FDA') various violations of federal regulations governing the plasmapheresis process and facilities." *Id*. AML was convicted of the conspiracy count and three counts of violating 18 U.S.C. § 1001. It was fined a total of $1,000.[1] *Id*. at 400.

Cecil Grain, Inc. (Cecil Grain), along with an individual defendant, was "found guilty, after a jury trial, on a three-count indictment charging making a false written statement to the Commodity Credit Corporation, and of converting large quantities of soybeans and wheat which were mortgaged and pledged to the Commodity Credit Corporation." 556 F. Supp. at 196. Cecil Grain was sentenced to a total fine of $20,000, $10,000 for each count of conviction.[2] The defendants moved for a reduction in sentence, which the District Court denied. The court found that, in connection with the first count, "the government loaned a larger amount than it should have, to the injury of the loan program." *Id*. at 197. Moreover, the court noted that the individual

---

[1] In 2019 dollars, that amount would be approximately $2,577. *See* https://www.inflationtool.com/us-dollar/1983-to-present-value?amount=1000.

[2] In 2019 dollars, that amount would be approximately $53,511. *See* https://www.inflationtool.com/us-dollar/1982-to-present-value?amount=20000.

defendant "deliberately violated the law to make money for himself" and "sold hypothecated goods for Three Hundred Eighty Thousand Dollars ($380,000) part of which he had for five months, and part for seven months." *Id*. The court calculated that money would have earned about $25,425 using the defendant's own rate of return. *Id*. The court reasoned that "the defendants not only had the use of this large amount of money without paying for it, but also made profits on the sale and later repurchase of the merchandise." *Id*. The court further reasoned, "The criminal intent involved in this matter was great indeed, and when the amount of the fines is reduced by the profits that the defendants realized, or could have realized, the penalty seems lenient, rather than harsh." *Id*. at 198.

Here, by willfully and materially misleading the OEE, Defendant may have thwarted OEE's ability to investigate the possible exportation of export-controlled technical data to persons and entities in China. Such investigation implicates national security concerns, especially given that the data was used in connection with a proposal to build an SRV for the PLA Navy. Moreover, although the government understands the pitch was unsuccessful, Defendant stood to earn a significant amount of money had BEIJING COMPANY won the contract with the PLA Navy. The recommended fine agreed to by the parties represents a reasonable sentence in this case.

## **CONCLUSION**

WHEREFORE, the government respectfully recommends that the Court accept the plea agreement and sentence Defendant to a sentence of a fine of $84,000.

                                        JESSIE K. LIU
                                        United States Attorney
                                        D.C. Bar No. 472845

By:         /s/
                                        Jolie F. Zimmerman
                                        Assistant U.S. Attorney
                                        U.S. Attorney's Office
                                        BAR NO 465110
                                        Jolie.Zimmerman@usdoj.gov

Certificate of Service

I HEREBY CERTIFY that a copy of the foregoing Memorandum in Aid of Sentencing was delivered via the Court's electronic filing system on counsel for the defendant, this 22nd day of November, 2019.

/s/
Jolie F. Zimmerman
Assistant United States Attorney